J-A12031-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: C.D., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: K.S., MOTHER | No. 2932 EDA 2015 |

Appeal from the Order Entered August 31, 2015,
In the Court of Common Pleas of Monroe County
Orphans' Court at No(s): 48 O.C.A. 2014 - 53 DP 2013

Appeal from the Order Entered August 18, 2015,
In the Court of Common Pleas of Monroe County
Juvenile Court at No(s): 48 O.C.A. 2014 - 53 DP 2013

BEFORE:  BENDER, P.J.E., PANELLA, J., and STEVENS, P.J.E.*

MEMORANDUM BY STEVENS, P.J.E.:                    **FILED JULY 06, 2016**

Appellant, K.S. ("Mother") appeals from the orders entered on August 31, 2015 and August 18, 2015 by the Honorable Jonathan Mark of the Monroe County Court of Common Pleas, that respectively, involuntarily terminated Mother's parental rights to her daughter, C.D. ("Child") (born October of 2010) under Section 2511 of the Adoption Act (23 Pa.C.S. § 2511) and changed the permanency goal for Child to adoption under Section 6351 of the Juvenile Act (42 Pa.C.S. § 6351).[1]  We affirm.

On June 26, 2013, Monroe County Children and Youth Services ("CYS") received a referral indicating that Child had been seriously injured.

---

* Former Justice specially assigned to the Superior Court.

[1] On August 31, 2015, the trial court also terminated the parental rights of C.D. ("Father") to Child.  Father is not party in this appeal, nor did he file his own separate appeal.

Mother's boyfriend, G.M., brought two and a half year old Child to the local hospital. G.M. reported that Child had fallen asleep in the car, woke up, may have had a seizure, started vomiting, and become unresponsive. At the time Child sustained these injuries, Mother was at a friend's house.

Due to the severity of Child's injuries, Child was transported to Lehigh Valley Hospital, a trauma center with a pediatric intensive care unit. Doctors discovered Child had cerebral bleeding, which was more accurately described as an extensive right-sided subdural hemorrhage. Child also presented with a hematoma to the left side of the head, redness on her left thigh, and tenderness on the left side of her neck. Based on the inconsistency between the injuries and the account of her caretakers, Child's age, and other factors, the treating physicians concluded Child's injuries could not have been caused by a seizure but were the result of non-accidental trauma.[2]

While Child was recovering in the hospital, Mother tested positive for cocaine and marijuana on June 27, 2013. After an emergency protective custody order was granted the following day, Mother stopped visiting Child in the hospital. On July 2, 2013, Child was discharged from the hospital and placed into foster care. Mother and G.M. were "indicated as perpetrators or perpetrators by omission because Child suffered non-accidental traumatic

---

[2] In addition, the doctors also discovered in a CT scan that Child had older hemorrhaging in the brain. Mother explained she brought Child to Lehigh Valley to assess that injury, which purportedly occurred after a gate fell on Child and Child fell off a bed while Child was in G.M.'s care.

injury in and around the brain while she was in legal and physical custody of Mother, and in the care of one or both, and the history they gave was medically inconsistent with [Child]'s injuries." Trial Court Opinion (T.C.O.), 11/10/15, at 4. Mother and G.M. did not appeal the finding of abuse.

On July 9, 2013, following a hearing, the trial court adjudicated Child dependent. After one supervised visit with Child, Mother told Child that her CYS caseworker was the devil. From that point on, Mother refused to visit or communicate with Child while she was in foster care in Monroe County as she asserted that supervised visits at the agency were not good for Child. Instead, Mother moved to Maryland, then Connecticut, and then to two different locations in New York. Even after Mother settled in Queens, New York, she declined to share her phone number or address with CYS.

Although Child's mother avoided contact with Child during this time, Maternal Grandmother visited C.D. while she was in foster care. In April 2014, Maternal Grandparents were approved as kinship foster resources, and Child moved to New York to live with them. Mother failed to attend three permanency review hearings held in April, July, and October 2014.

On October 27, 2014, CYS filed an initial petition to terminate Mother's parental rights. When Mother indicated she would comply with CYS's reunification requirements, CYS withdrew the petition "to allow [Mother] additional time to comply with the goals of the Child permanency plan." CYS Motion, 11/6/14. Nevertheless, CYS filed the instant termination petition on

February 5, 2015, as Mother had missed four hearings in a row, did not communicate with CYS, and failed to complete her service plan goals. At that point, Child had been out of Mother's care for nineteen months. A CYS caseworker contacted Father, who admitted he was not in a position to care for Child. Father indicated Mother was still seeing G.M. and had given birth to another child. Mother would not confirm or deny this allegation.

Several termination hearings were held between April and August 2015 at which the following individuals testified: Kristine Weber, a CYS caseworker; Sarah Stiff, a CYS intake supervisor; Dr. Joseph Stirparo, a doctor at Lehigh Valley Physicians Group; Maternal Grandmother; and Mother. On August 18, 2015, the trial court changed Child's permanency goal to adoption. On August 31, 2015, the trial court entered an order terminating Mother's parental rights. On September 17, 2015, Mother filed a notice of appeal, challenging both orders. On September 24, 2015, Mother filed a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[3]

Mother raises the following issues:

1. Did the [trial court] err in deciding that there was clear and convincing evidence terminating Mother's parental rights, pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5) and (8)?

---

[3] In a children's fast track appeal, the appellant must file the Rule 1925(b) statement contemporaneously with their notice of appeal. Pa.R.A.P. 1925(a)(2)(i). This requirement, however, is procedural, rather than jurisdictional; a failure to comply is handled on a case-by-case basis. *In re K.T.E.L.*, 938 A.2d 745 (Pa. Super. 2009). We will not find Mother waived her issues due to the delayed filing of her Rule 1925(b) statement.

2. Did the [trial court] err in deciding that there was clear and convincing evidence presented at the trial that termination of Mother's parental rights would serve the emotional needs and welfare of [C]hild?

3. Did the [trial court] err when it decided that the goal in this case should be changed from reunification to adoption?

4. Did the [trial court] err when it permitted a hearsay statement of [F]ather of [C]hild to be admitted at trial when [F]ather was not present?

Mother's Brief at 11.

Our standard of review in termination cases is as follows:

When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re S.H.*, 879 A.2d 802, 805 (Pa. Super. 2005) (citation omitted). In termination cases, the burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for the termination of parental rights are valid. *Id.* at 806. We have previously stated:

The standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003) (quotation marks omitted).

Moreover, "[t]he trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G. & J.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa. Super. 2003) (citation omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

To affirm the termination of parental rights, this Court need only agree with the trial court's decision as to one subsection of Section 2511(a), in

addition to analyzing Section 2511(b). ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Herein, we review the orders pursuant to Sections 2511(a)(1) and (b), which provide as follows:

> **(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> > \* \* \*
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1) and (b).

To meet the requirements of Section 2511(a)(1), "the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." ***In re Z.S.W.***, 946 A.2d 726, 730 (Pa. Super. 2008) (citing ***In re Adoption of R.J.S.***, 901 A.2d 502, 510 (Pa.

Super. 2006)). The court must then consider the parent's explanation for his or her conduct and the post-abandonment contact between parent and child before moving on to analyze Section 2511(b). *Id.*

This Court has explained that a parent does not perform his or her parental duties by displaying a "merely passive interest in the development of the child." *In re B.,N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004), *appeal denied*, 872 A.2d 1200 (Pa. 2005) (quoting *In re C.M.S.*, 832 A.2d 457, 462 (Pa. Super. 2003), *appeal denied*, 859 A.2d 767 (Pa. 2004)). Rather, "[p]arental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances." *In re B.,N.M.*, 856 A.2d at 855 (citation omitted).

Mother argues that the trial court erred in deciding that there was clear and convincing evidence to terminate Mother's parental rights to Child. Mother's brief at 11. Mother contends that CYS created a situation where Mother could not follow the requirements that were "being demanded of her by [CYS]." *Id.* at 32.

The trial court found that, for more than two years, Mother failed to perform parental duties and Mother has not remedied the conditions that led to Child's placement. T.C.O., 11/10/15, at 29.

> [Child] became dependent because she was seriously injured while in the care of Mother and [G.M.] and their explanation of how [Child] was hurt was medically inconsistent with her injuries. In addition, their timeline was off. Neither Mother nor

- 8 -

[G.M.] appealed the indicated abuse finding and Mother has never given a medically plausible account of how [Child] was injured.

As of the filing of the termination petition, [Child] has been dependent and in care for nineteen months. By the end of termination hearing, this period had increased to more than two years. As noted, there was still no true explanation as to how [Child] was injured. During the early part of this case, Mother did not visit [Child]. Instead, Mother moved or attempted to move to another state while [Child] was in foster care. When Mother finally settled in New York, she began visits that were supervised by [M]aternal [G]randmother. However, as discussed above, she has not completed her other service plan goals. Similarly, Mother's failure to cooperate, her secretive nature, her incredible statements and testimony, her checkbox method of attempting to show compliance have left open many questions as to Mother's current ability to keep [Child] safe or to properly parent her, the security and stability of Mother's home, and the nature of Mother's relationship with people who may come into contact with [Child]. There is also indication that Mother is still with [G.M.], the person in whose care she says [Child] was when seriously injured, and there is also some indication that Mother has added to her family by having a child about which [CYS] and [the trial c]ourt know nothing. Finally, for more than two years foster parents and now [M]aternal [Grandparents], not Mother, have provided care, comfort, and love for [Child].

*Id.* at 28.

Ms. Weber testified that Mother's goals were (1) to remain in touch with CYS; (2) to inform CYS of any address changes; (3) to maintain a stable address; (4) to complete a parenting plan; and (5) to provide urine screen tests to CYS. N.T., 8/17/15, at 71. Mother did not attend four consecutive permanency hearings in April 2014, July 2014, October 2014, and January 2015. Mother then testified that she failed to appear to at the hearings because she was "probably working," claiming to be the CEO of an

airport parking business at JFK Airport. *Id.* at 105-106. Mother testified that her airport parking facility is open 24 hours a day, 7 days a week, but "pretty much runs itself with [her employees]." *Id.* at 106. She also claimed to have several other businesses, but later could not recall what they were. *Id.* at 117-19.

Mother admitted that she did not have a stable address, but moved at least four times to four different states during the time Child was in foster care. *Id.* at 92-94, 122. Ms. Weber testified Mother claimed to have lived in Bushkill, Pennsylvania, then to Virginia, then to Connecticut and finally to New York. *Id.* at 74. Ms. Weber shared that Mother's whereabouts were unknown until Maternal Grandmother informed Ms. Weber that Mother lived in Queens, New York, and also gave Ms. Weber a South Ozone Park, New York address. *Id.* at 74-75. Moreover, Ms. Weber testified that Child had been residing with Maternal Grandparents in Staten Island, New York for over a year. *Id.* at 54.

When questioned about her initial positive drug test for cocaine, Mother questioned the accuracy of the result as she did not get the opportunity to have independent testing done on it. *Id.* at 105. She opined that the lab must have gotten a positive test from another individual and put her name on it. *Id.* Mother did regularly submit for drug testing as required by CYS. When asked about her delay in taking a parenting class, Mother claimed that she had done so earlier with a company that was a scam before

attending a court-accepted parenting class. *Id.* at 108. Mother presented evidence of her completion of the parenting class.

Although one of Mother's service goals was to remain in touch with CYS, Ms. Weber testified about her repeated failed attempts to contact Mother. Mother would not return her calls, and ignored Ms. Weber's requests for information to complete the Interstate Compact on the Placement of Children ("ICPC") application. *Id.* at 30, 34, 42-45. If Ms. Weber was able to reach Mother on the phone, Mother would hang up. *Id.* at 47-48. Mother would call from time to time and leave "sporadic voicemails" with no helpful information. *Id.* at 53. Mother claimed she never hung up on Ms. Weber, but blamed the "horrible" cell phone service in Queens. Nevertheless, Mother bragged about having two phones for her business where she could be reached 24 hours a day. *Id*.

The trial court did take into account that Mother began to give Child gifts and have sporadic visits with Child while she was in Grandmother's care, but noted some of the "progress" Mother made occurred after the filing of the termination petition; thus, it was not considered. T.C.O., 11/10/15, at 29. Nevertheless, the trial court found that "despite many services being offered, Mother has neither remedied the conditions which caused [Child] to come into care nor satisfied service plan goals." *Id*. We agree and emphasize that "a child's life simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of

parenting." ***In re Z.S.W.***, 946 A.2d at 726. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." ***In re B., N.M.***, 856 A.2d at 856.

Mother's argument regarding Section 2511(a)(1) essentially seeks for this Court to make credibility and weight determinations different from those of the trial court. We defer to a trial court's determination of credibility, absent an abuse of discretion. ***In re M.G.***, 855 A.2d at 73-74. Consequently, we find no abuse of discretion in the trial court's finding of grounds for termination of Mother's parental rights under Section 2511(a)(1).

The trial court must also consider how terminating Mother's parental rights would affect the needs and welfare of Child pursuant to Section 2511(b). Such an inquiry is specifically directed to a consideration of whether termination of parental rights would best serve the developmental, physical and emotional needs of the child. ***See In re C.M.S.***, 884 A.2d 1284, 1286-87 (Pa. Super. 2005), *appeal denied*, 587 Pa. 705, 897 A.2d 1183 (2006). "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." ***Id.*** at 1287 (citation omitted). We have emphasized that the court must also discern the

nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. ***See id.***

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

***In re Adoption of C.D.R.***, 111 A.3d 1212, 1219 (Pa. Super. 2015) (citations omitted).

> The trial court found:

> Because a bond exists between Mother and [Child], this aspect of the termination analysis was a close call at the time the petition was filed. However, by the end of the hearing, and after full consideration of all facts, circumstances, and the best interest of [Child], we were firmly convinced that severing the bond with Mother and preserving the bond with [M]aternal [G]randparents was in [Child]'s best interest. We remain convinced.

> [C]hild needs and deserves permanency, stability, love, support, and parental care. From the time [Child] was injured, Mother has neither provided the requite level of care nor demonstrated the ability to meet [Child]'s needs in the future.

T.C.O., 11/10/15, at 29-30 (citations omitted).

Mother argues that she and Child have "an enduring bond that has been maintained throughout this period of dependency." Mother's Brief at 39. During the hearing, Mother testified that she loves Child and would do anything for her. N.T., 8/17/15, at 115. Maternal Grandmother testified that Child loves Mother, and they get along well. ***Id.*** at 77. Maternal

Grandmother testified that Mother buys Child clothes and gifts. *Id.* at 78. Maternal Grandmother stated that the interaction between Mother and Child is very loving, and that Child runs to Mother. *Id.* at 81. Maternal Grandmother opined that, after Child visits with her Mother, "she gets upset and cries" because "she doesn't want to leave" Mother. *Id.* at 82.

The trial court found "Mother's visits and expressions of love have not been enough to prompt her to complete her service goals or allow authorities in either Pennsylvania or New York to confirm her living situation, her ability to parent, and her capacity to protect." T.C.O., 11/10/15, at 30. The trial court described the bond been Mother and Child as "attenuated." *Id.* The trial court stated that "the attenuation is objectively and clearly demonstrated by Mother's initial refusal to visit; her moves or attempts to move to other jurisdictions and, in the later stages of the case, her abject refusal to cooperate with either [CYS] or the ICPC process to get [Child] back." *Id.* Additionally, the guardian *ad litem* testified to the following:

> For Mother, I was a little bit more hesitant because of the bond [Mother] has with [Child], and it's very evident just from the conversation I had with [Mother, Maternal Grandmother], and from [Mother]'s testimony today, that there is a bond there.
>
> * * *
>
> It's clear to me that [Mother] is unwilling to cooperate with [CYS]. It's clear that she has not taken any responsibility for any of her actions. It's always somebody else's fault or something's not quite right or this lab is shady or whatever.
>
> It's also clear that she will do something that the [t]rial [c]ourt is requesting, like the urine screen tests, but not in the

- 14 -

manner that they are requested. So with that, I don't have a clear indication of my position. I think [CYS] has met their burden today, but it's not something that I came to easily.

N.T., 8/17/15, at 130-131.

Furthermore, the trial court found removing Child from Maternal Grandparent's care would be "extremely detrimental" to Child. T.C.O., 11/10/15, at 31. The trial court found Maternal Grandparents have parented Child "and provided the love, comfort, security, physical, mental, and emotional stability that [Child] deserves." *Id.* at 31. Ms. Weber testified that Child is doing well with Maternal Grandparents. N.T., 8/17/15, at 68.

Even though Mother and Maternal Grandmother testified that there is an existence of a bond between Mother and Child, Mother was "unable to satisfy the irreducible minimum requirements of parenthood." ***See In re T.D.***, 949 A.2d 910, 920-23 (Pa. Super. 2008), *appeal denied*, 601 Pa. 684, 970 A.2d 1148 (2009) (affirming the termination of parental rights where "obvious emotional ties exist between T.D. and Parents, but Parents are either unwilling or unable to satisfy the irreducible minimum requirements of parenthood," and where preserving Parents' rights would prevent T.D. from being adopted and attaining permanency). Accordingly, we will not disturb the trial court's determinations.

In her third claim, Mother claims that the trial court erred in changing Child's goal from reunification to adoption. Lastly, Mother argues that the trial court erred when it permitted a hearsay statement of Child's father to

be admitted at trial when Father was not present.  Mother's Brief, at 44. Mother did not present either claim for review in her 1925(a) concise statement of errors complained of on appeal.  Therefore, we find both claims to be waived.  ***See Krebs v. United Refining Company of Pennsylvania,*** 893 A.2d 776, 797 (Pa. Super. 2006) (holding that an appellant waives issues that are not raised in both his or her concise statement of errors complained of on appeal and the statement of questions involved in his or her brief on appeal).

After careful review, we affirm the trial court's decisions to terminate Mother's parental rights on the basis of Section 2511(a)(1) and (b) of the Adoption Act, and change Child's permanency goal to adoption under Section 6351 of the Juvenile Act.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/6/2016